VAN VECHTEN *against* HOPKINS.

THIS was an action for a *libel.* The declaration contained two counts, one for writing, composing and publishing, and the other for printing and publishing the alleged libel. The first count was as follows :

" *Abraham Van Vechten* complains of *David I. Hopkins,* in custody, &c. for that whereas the said *Abraham* now is, and hitherto hath been, a good, faithful and honest citizen of the state of *New-York,* and of a good name, fame and reputation, and at the time of making, devising, composing, writing and publishing the false, scandalous and malicious libel, hereinafter first mentioned, of and concerning the said *Abraham,* and a long time before, he the said *Abraham,* had been duly appointed by the honourable the council of appointment for the said state, to, and held, the office of recorder of the city of *Albany,* in the county of *Albany,* and had, at an election held in and for the city and county aforesaid, to wit, on the last *Tuesday* of *April,* in the year of our Lord one thousand eight hundred and five, been duly elected a member of the assembly in the legislature of the said state, in and for the said city and county, for the term of one year from the first day of *July,* in the year aforesaid, and held, exercised and enjoyed the office or place of a member of the said assembly, in pursuance of such election, that is to say, at the city and in the county aforesaid : Yet the said *David,* not regarding the premises aforesaid, but contriving and maliciously intending to draw and bring the said *Abraham* into dis-

Whether a libel was published of and concerning the plaintiff, or whether by the person mentioned in the libel the plaintiff was intended, is a question of fact for a jury to decide.

Where libellous matter is charged against some particular person, who is so ambiguously described, that the person meant cannot be identified, without the aid of extrinsic facts, there, by the introduction of proper *averments* and a *colloquium,* the words, taken in connection with the whole libel, may be rendered sufficiently certain to support the action, so as to render it proper to permit the whole to go to the jury as a question of fact, under the direction of the judge; who may, however, if the evidence appears to him too vague and inconclusive to warrant a verdict for the plaintiff, order a nonsuit.

In an action for a libel, the plaintiff cannot prove by witnesses, that, from reading the libel, they believe the person intended in the libel, was the plaintiff.

An *innuendo* cannot be proved ; but where an *averment* or *colloquium* introduces extrinsic matter into the pleadings, that is a proper subject of proof.

grace, contempt and ignominy with the faithful and ho-nest citizens of the said state in general, but more parti-cularly with the honourable the said council of appoint-ment, and the electors for members of the legislature of the said state, and to cause it to be believed, that the said *Abraham*, as a member of the assembly as aforesaid, had entered into and was concerned in a corrupt league and confederacy with divers members of the said legis-lature, and other citizens of the said state, to promote, by base, corrupt and venal means, and for sinister pur-poses, the election of *Morgan Lewis*, esquire, who, at the time of making, devising, composing, writing and publishing the said false, scandalous and defamatory libel hereinafter first mentioned, was nominated, and stood a candidate, at an election thereafter to be held, and since holden in and for the said state, to wit, on the last *Tuesday* of *April*, in the year of our Lord one thou-sand eight hundred and seven, for the office of governor of the said state, to wit, on the thirtieth day of *March*, in the year last aforesaid, at the city of *Albany* afore-said, and in the county aforesaid, did make, devise, compose, write and publish, and cause to be made, de-vised, composed, written and published, a certain false, scandalous and malicious libel, of and concerning him the said *Abraham*, according to the tenor following, that is to say : State of *New-York*, ss. City and county of *New-York*. I, *Henry Meigs*, notary public, in and for the state of *New-York*, duly commissioned and sworn, (a certain *Henry Meigs*, then being a notary public, in and for the state of *New-York*, meaning,) do hereby (by the notarial attestation of the said *Henry Meigs* to the said false, scandalous and malicious libel, hereafter stated, meaning) certify, that personally came and ap-peared before me, (the said *Henry*, as a notary afore-said, meaning,) *David I. Hopkins*, of *Morristown*, *New-Jersey*, lately from the college of *Middlebury*, state of

*Vermont*, (the said *David* meaning,) who, (the said *David* meaning,) being duly sworn by me, (the said *Henry*, as a notary aforesaid, meaning,) saith, that some time in *March*, or the beginning of *April*, 1806, (the month of *March* or *April*, in the year of our Lord one thousand eight hundred and six, meaning,) he (the said *David* meaning) went to the office of *Abraham Van Vechten*, esquire, (the office of the said *Abraham* meaning,) in *Albany*, (in the said city of *Albany* meaning,) in company with Major *John Lansing*, (a certain *John V. A. Lansing*, of the town of *Watervliet*, in the said county of *Albany*, meaning,) at the said office, (the office of the said *Abraham* meaning,) there arose some conversation between Major *Lansing* and Mr. *Van Vechten*, (the said *John* and *Abraham* meaning,) in the course of which, (the said conversation meaning,) Major *Lansing* (the said *John* meaning) made several severe remarks and animadversions upon the political character of Governor *Lewis*, (the said *Morgan Lewis* meaning,) in consequence of which remarks Mr. *Van Vechten* (the said *Abraham* meaning) said to him, (the said *John* meaning,) these severe remarks and animadversions which you (the said *John* meaning) have made respecting Governor *Lewis*, (the said *Morgan Lewis* meaning,) will not do, for we (the said *Abraham* averring, that himself and other citizens of the said said state, belonging to the political party denominated federalists, were thereby meant and intended) have agreed to support him (the said *Morgan Lewis* meaning) at the ensuing election, (the election for governor in the state aforesaid, to be held on the last *Tuesday* of *April* then next ensuing meaning.) Mr. *Van Vechten* (the said *Abraham* meaning) then produced a written instrument, which he (the said *Abraham* meaning) put into the hands of Major *Lansing*, (the said *John* meaning,) who (the said *John* meaning) read it, (the said written instrument meaning.)

Major *Lansing* (the said *John* meaning) then laid it (the same instrument meaning) down on the table, and went into conversation with Mr. *Van Vechten*, (the said *Abraham* meaning.) This deponent, (the said *David* meaning,) while these gentlemen (the said *John* and *Abraham* meaning) were conversing, turned over the said instrument of writing, which (the same instrument meaning) purported to be an agreement containing articles of coalition. The first (meaning the first of the said articles) was an engagement by several leading federal men, whose names were thereto (to the said articles of coalition meaning) subscribed, to support with all their strength and influence, the next election (the election on the last *Tuesday* of *April* last mentioned meaning) of Governor *Lewis*, (the said *Morgan Lewis* meaning.) (The said *Abraham* averring, that by the said several leading federal men, whose names were to the said articles of coalition subscribed, to support, with all their strength and influence the next election of Governor *Lewis*, himself, the said *Abraham*, and several other leading men of the political party denominated federalists, as aforesaid, were meant and intended.) In consideration of this federal article of agreement, (the aforesaid articles of coalition meaning,) there was an article, (in the said articles of coalition meaning,) stating that the friends of Governor *Lewis*, whose names were thereto subscribed, (the friends of the said *Morgan Lewis*, whose names were subscribed to the said articles of coalition, meaning,) should exert all their power and influence (the power and influence of the last mentioned subscribers meaning) to cause the election of *S. Van Rensselaer*, esquire, (*Stephen Van Rensselaer*, of the town of *Watervliet*, in the said county of *Albany*, esquire, meaning,) to the office of governor, in the gubernatorial election of 1810, (the election for governor, to be held in and for the state aforesaid, in the year of our Lord

one thousand eight hundred and ten, meaning.) This deponent (the said *David* meaning) believes that there were as many names subscribed to the said agreement (the said articles of coalition meaning) as fifteen or twenty, principally *quid* and federal members of the legislature, (the said *Abraham* averring, that by the *quid* members of the legislature aforesaid were meant and intended the subscribers to the said articles of coalition, who were members of the legislature of the state aforesaid, belonging to the political party attached to the said *Morgan Lewis*, denominated quids, and that by the federal members of the legislature aforesaid were meant and intended the subscribers to the said articles of coalition who were members of the said state, and attached to the political party aforementioned, denominated federalists.) That this deponent (the said *David* meaning) being on terms of intimacy with Mr. *Lansing*, (the said *John* meaning,) had frequent conversations with him (the said *John* meaning) after the circumstances above stated had taken place, (the circumstances as in the libel herein before stated meaning,) and in these conversations (the last-mentioned conversations meaning) this deponent (the said *David* meaning) often heard Major *Lansing* (the said *John* meaning) explicitly state, that the coalition (the aforesaid coalition meaning) between the friends of the governor (the friends of Governor *Lewis* meaning) and the federal party (the said *Abraham* averring, that himself and other citizens of the said state, belonging to the political party denominated federalists, were thereby meant and intended) was the only way and means of again restoring the federal party (the citizens of the said state belonging to the political party denominated federalists, as aforesaid, meaning) to power; (the government of the said state meaning;) and that the federal party (the said *Abraham* and other citizens of the said state belonging

to the political party denominated federalists, as aforesaid, meaning,) was assured of the support and influence of the *Livingston* family (the relatives by marriage of the said Governor *Lewis* meaning,) for the same object above mentioned, (the restoring of the federal party to power as aforesaid meaning.)

By reason whereof, &c. The damages were laid at 5,000 dollars.

The cause was tried at the *Albany* circuit, in *October*, 1808, before Mr. Justice *Spencer*.

At the trial, it was proved, that the defendant was the author and publisher of the libel; that the plaintiff, at the time when the corrupt agreement is charged to have been made in the libel, and, at the publication thereof, was recorder of the city of *Albany*, and, at the former period, was a member of the assembly of this state; and that he is the only person of the name of *Abraham Van Vechten*, in the city of *Albany*; and kept an office there.

The plaintiff then offered to prove by a witness, that from reading the libel, he applied it to the plaintiff, and understood him to be the person intended, as one of the federal members of the legislature, who had subscribed to the corrupt agreement charged in the libel; but this evidence was overruled by the judge, on the ground that it was the province of the court to determine, from a perusal of the libel, whether it was the intention of the defendant to charge the plaintiff as being one of the members of the legislature who subscribed the corrupt agreement; it being admitted by the plaintiff's counsel, that there were no circumstances, within the knowledge of the witness, except what he obtained from reading the paper itself, to influence his belief as to the person intended. The judge also decided, that the libel itself did not afford sufficient evidence of the charge, that the plaintiff was one of the members of the legislature who

subscribed to the corrupt agreement mentioned. The
plaintiff's counsel excepted to the opinion of the judge;
and a nonsuit was directed to be entered, with leave to
the plaintiff to move to set it aside, and for a new
trial.

*Henry*, for the plaintiff. The question is not whether
the matter set forth in the declaration is a libel, or will
support the action; but whether parol or extrinsic evi-
dence to show the pertinency of the libel, or the person
intended, is admissible; and whether that is a question
of fact for a jury, or is to be decided by the court. I con-
tend that it belongs exclusively to the jury to say who
was the person intended by the libel. The words imply
an imputation against certain persons, described as lead-
ing federal men, without naming any individual; it is
the peculiar province of a jury to determine whether the
plaintiff is intended.

The person intended is not made out in the plain-
tiff's declaration, by *innuendoes*, but by averments. The
fact was thus put in issue, and must be tried. If the
issue was improper or illegal, still it must be tried;
and the defendant, if he thinks fit, may afterwards move in
arrest of judgment. Where a fact is put in issue, by the
pleadings, and is sent down to be tried at *nisi prius*,
under a delegated authority, it must be tried by the jury,
and cannot be decided by the judge. The court can only
decide on a demurrer, or in arrest of judgment. Where
there is an uncertainty as to the person, that is made
certain by an averment; and that being a substantive
fact in issue, it must be tried. If a person be libelled by
signs, pictures or hieroglyphics, so that no doubt can be
entertained by the court, who was the person intended,
yet the fact who was the person intended, must be proved
by witnesses.* There must be an averment as to the

* 4 *Bac. Abr.*
453. *Libel*, (A.
3.) 2 *Barnard.
K. B.* 138. 166.

NEW-YORK,
Nov. 1809.

VAN VECH-
TEN
v.
HOPKINS.

person intended ; for it is not the subject of an *innuendo.* A writing may be libellous without reflecting on any particular person. A scandalous publication concerning three or four, may be punished on the complaint of one of them.* Though a publication against the whole community, or against all ecclesiastics, would not be a libel ; yet if it be against the *bishops*, or a particular class of men, it will be libellous.† An indictment will lie for such a libel as a public offence ; and any individual who can show by proof, that he was one of the persons intended to be defamed, may maintain an action.

*Foot* and *Skinner*, contra. There is no distinction between written or unwritten slander, as to the point now before the court. Words written must be as specific and certain, as to the person intended, as words spoken. If words are spoken of one of the servants of *J. S.* without designating which, no action lies. The rule is the same in an action for a libel. Where there is an ambiguity arising on the face of the writing, the court must decide on the meaning ; but where the ambiguity arises from any thing extrinsic, or *dehors* the writing, it may be explained by witnesses. A witness is never produced to prove a fact, which the court and all the world know as well as himself. All the knowledge of the witness, in the present case, was derived from the paper ; and is a witness to be introduced to explain the meaning of the *English* language ? There is no averment that the plaintiff was a leading federalist. An averment is not to be made out or helped by an *innuendo.*‡ Does, then, the paper, in itself, clearly import that the plaintiff was the person intended ? No reader can fairly bring the words home to the plaintiff, individually.

The doctrine as to the manner in which a libel is to be made out, is fully stated in the case of *The King* v. *Horne.*§

* 1 *Lutw.* 52.
254 2 *Burr*
984. 3 *Mod.*
139. 1 *Ld. Raym.*
879.
† 3 *Salk.* 224.
pl. 5. 2 *Str.* 788
*Hawk.* B. 1. c.
73. § 9.

‡ 8 *East*, 427.

§ *Cowp.* 672.

The court, having, as we contend, a right to judge from the face of the libel, as it is set forth in the pleadings, whether it is a libel of and concerning the plaintiff, the question arises, whether, the judge in this case, decided rightly? How can this libel be applied to the plaintiff, more than to any other leading federalist? Can the court know judicially what are the political principles of the plaintiff, or to what political party he belongs?

Again, it should appear that the plaintiff was a member of the legislature, at the time of the publication of the alleged libel. In fact, he was not a member of the legislature at that time, and so he could not be libelled as such.

On general principles, this action cannot be maintained. If the present plaintiff can recover against the defendant, then every leading federalist, and every friend of governor *Lewis*, who was a member of the legislature, may have an action against him, and he be thus overwhelmed with a thousand suits.

In the case of a *nuisance*, an individual cannot have his action, without showing special damage. The proper remedy is by indictment, where special damage cannot be proved. This distinction will apply to the cases which have been cited to show that the present action is maintainable, for they were all cases on indictments.

*Shepherd*, in reply, observed, that if the court are to decide who is the person meant in the libel, it would be useless to insert any averment or *innuendo*, as to that fact, in the declaration. It is said that the declaration is defective, in not stating the fact that the plaintiff was a leading federalist, and the person intended; and yet it is argued, that if the fact had been averred, the jury could not decide on the truth of the averment. If the doctrine contended for by the defendant's counsel, is to prevail,

the trial by jury in cases of libels, would be virtually abolished, for the truth of every *innuendo* and averment would be decided by the court. It is not necessary that the person intended to be libelled, should be named in the publication ; he may be described by certain characteristic or peculiar marks ; and the court are to make the application. It is understood to be the constant practice at *nisi prius*, in suits for libels, to call witnesses to say whether, from perusing the paper, they believed the plaintiff to be the person intended. The propriety of such testimony has never before been questioned.

VAN NESS, J. The decision of the questions arising in this case, will be greatly facilitated by first defining the meaning and office of an *averment*, a *colloquium* and an *innuendo*. The use in pleading of an *averment*, is to ascertain *that* to the court, which is generally, or doubtfully expressed ; so that the court may not be perplexed *of whom*, or *of what*, it ought to be understood; and to *add* matter to the plea to make doubtful things clear. (*System of Pleading*, 121.) A *colloquium*, serves to show that the words were spoken in reference to the matter of the averment. An *innuendo* is explanatory of the subject matter sufficiently expressed before ; and it is explanatory of such matter only ; for it cannot extend the sense of the words beyond their own meaning, unless something is put upon the record for it to explain. This may be illustrated by *Barham's* case. (4 *Coke's Rep*. 20.) *Barham* brought an action for the defendant's saying of him. " *Barham* burnt my barn," (*innuendo*) " a barn with corn." The action was held not to lie ; because burning a barn, unless it had corn in it, was not felony. " But if in the introduction, it had been averred that the defendant had burnt a barn full of corn, and that in a discourse about that barn, the defendant had spoken the

words charged in the declaration, an *innuendo* of its being the barn full of corn would have been good; for by coupling the *innuendo* in the libel, with the introductory averment, it would have been complete." (*De Grey*, Ch. J. in *Rex* v. *Horne, Cowp.* 184.) Here the extrinsic fact that the defendant had a barn full of corn, is the *averment.* The allegation that the words were uttered in a conversation in reference to that barn, is the *colloquium;* and the explanation given to the words thus spoken, is the *innuendo.* (See also *Hawkes* v. *Hawkey,* 8 *East,* 427.) The application of these principles to the present case, will be seen in the sequel.

NEW-YORK,
Nov. 1809.

VAN VECH-
TEN
v.
HOPKINS.

The averment of extrinsic matter, in this declaration, was for the purpose of showing that the libel was published, as it is expressly alleged to have been, " *of and concerning the plaintiff.*" And whether it was so published or not, is a question of fact, which it is the province of the jury, and not of the court to decide.

This has been so held in a great number of instances; and is so reasonable and just a rule, that it cannot fail of receiving universal assent. Were the law not so, the jury, in case of libels, would be nothing, and the court every thing. In *England,* until lately, the court assumed the exclusive right to determine whether the writing charged, was or was not libellous. If the meaning and application of the libel, is also to be determined by the court, it would be going one step further; and nothing would remain for the jury but the single, and the rarely disputed fact, of publication.

In the very lucid opinion, delivered by Lord Ch. J. *De Grey,* in the house of lords, (in the case of *The King* v. *Horne,*) which contains a complete analysis of the law on this subject, he observes, that " it may happen that a writing may be so expressed, and in such clear and unambiguous words, as that it may amount of itself to a libel. In such a case, the court wants no circum-

stances to make it clearer than it is of itself. But if the terms of the writing are general, ironical, or spoken by way of allusion or reference, although every man who reads such a writing, may put the same construction upon it, it is by understanding something not expressed in direct words, and it being a matter of crime, and the party liable to be punished for it, there wants something more. It ought to receive a judicial sense, whether the application is just ; and the *fact,* or the *nature of the fact* on which *that* depends, *is to be determined by a jury.*" In the case of *The King* v. *Andrews,* (9 *St. Tr.* 679.) which was one of the many prosecutions that followed the rebellion in 1745, (when it is presumed the judges of the *English* courts did not relax in asserting the rights which constitutionally appertained to their offices,) the prisoner was indicted for publishing a treasonable libel, in vindicating the rights of the pretender to the *British* throne. An objection was made, that it was not shown with sufficient certainty, that the pretender was meant to be designated by the words " The Chevalier," as he was called in the libel. Lord Ch. J. *King,* in his charge to the jury, commenting on this objection observes, " The case here is a positive charge that the book the prisoner wrote, relates to the pretended prince of *Wales ;* and *the matter of fact you are to try is whether it is so or no.*" In another part of his charge he says, " that the matter of fact *you* are to consider," &c. To the same effect are many other cases in the books. (*Roberts* v. *Campden,* 9 *East,* 93. and the cases there cited. *Oldham* v. *Peake,* 2 *Wm. Bl. Rep.* 959.)

I do not, however, mean to deny that cases exist, in which the words in themselves were held to be so vague and uncertain, as that it could not be intended they were spoken of *any person ;* and where, for that reason, they could not be made actionable by an averment. I agree, too, that the court, and not the jury, are to judge whether

such uncertainty exists in the case now under consideration. Such for example are the cases of *Leawkner* v. *Godnam*, (3 *Bulst.* 249.) and *Johnes* v. *Dovers*, (*Cro. Eliz.* 496.) There are other cases again in which, as in the case now under consideration, the words in themselves amount to a libellous charge upon some particular person, but where that person is so ambiguously described, as that without the aid of extrinsic facts, his identity cannot be ascertained; but where, by the introduction of proper averments, and a *colloquium*, the words may, notwithstanding, be rendered sufficiently certain to maintain an action. Such is the case of *Baker* v. ——, (*Bulst.* 72.) *Wiseman* v. *Wiseman*, (*Cro. Jac.* 107.) The case of *Roberts* v. *Campden* also recognises the same doctrine. The certainty in the latter kind of cases, is arrived at, by taking into consideration, both the extrinsic facts stated in the averments, and *colloquium*, and the whole of the libel, all of which must be submitted to the jury, under the direction and charge of the judge, as in other cases. The evidence may sometimes be so inconclusive as not to entitle the plaintiff to carry the cause to the jury, and in that event it would be the duty of the judge to order a nonsuit. With these exceptions and qualifications, the application, or allusions in a libel are questions of fact, and the decision belongs exclusively to the jury.

This brings me to the consideration of the true question in this cause, viz. was there sufficient evidence in this case to warrant the jury to find that the plaintiff was intended to be charged as being one of the parties to the corrupt agreement stated in the libel? If this should be decided against the plaintiff, a new trial would be useless; for notwithstanding it is the right of the jury to determine this fact, yet if in the opinion of this court, they would not be authorised, by the evidence, to find for the plaintiff, we should set the verdict aside.

Before I proceed to consider this question, it is neces-sary to state certain rules of law, which are to govern in the determination of it. In the case of *The King* v. *Horne*, already often adverted to, it is laid down, " that as the crime of a libel consists in conveying and impress-ing injurious reflections upon the minds of the subject; if the writing be so understood by all who read it, the *injury is done* by the publication of these injurious re-flections, *before* the matter comes to the jury and the court. And if courts of justice are bound by law to study by any one possible or supposable case or sense, in which the words used might be innocent, such a *sin-gularity of understanding might screen an offender*, but it would not recall the words, or remedy the injury. It would be strange to say, and more so to give out, as the law of the land, that a man should be allowed to *defame* in one sense, and *defend* himself by another." (*De Grey*, Ch. J.) In the same case, Lord *Mansfield*, lays down the same rule. (See also, as to this point, Lord *King's* charge to the jury, in *The King* v. *Andrews* ; and *Wool-noth* v. *Meadowes*, 5 *East*, 463.) With these rules for our guide, let us consider the facts stated in the libel, and the proof given at the trial. The plaintiff, it was proved, was a member of the legislature. The libel states that when *Lansing*, in the plaintiff's office, made several severe remarks on the political character of go-vernor *Lewis*, the plaintiff told him, by way of caution, " these severe remarks which you have made, won't do, for *we* have agreed to support him at the ensuing elec-tion." The obvious import of the word *we*, as here used, taken into connection with what precedes, and fol-lows it, and as it would be understood by all the world, is that the plaintiff was one of those who had agreed to support governor *Lewis*. Immediately after the plain-tiff had communicated to Mr. *Lansing* the existence of this agreement, he is represented to have produced the

written articles of the coalition, subscribed by 15 or 20 persons, principally *quid* and *federal* members of the legislature, (a description which may embrace the plaintiff,) which he submitted to *Lansing's* perusal. For what purpose? Most clearly, I think, as containing the evidence of the agreement previously spoken of, and to which the plaintiff avowed himself to be a party. But the libel does not stop here. The plaintiff is said to have *produced* the written agreement; and hence it appears, that he was intrusted with the custody of it. Does not this fact, connected with the other circumstances, lead the mind irresistibly to conclude, that he was intended to be charged as being a party to it? Upon this brief statement of the facts, I think the defendant's intention is so palpably clear and certain, as to preclude the possibility of a difference of opinion respecting it. Indeed, it strikes me that there is not even the appearance of an attempt to disguise it; and such, I presume, would and ought to have been the conclusion of the jury, if the case had been left to them, as according to my view of the law it ought to have been. Upon this ground, I am of opinion, that there ought to be a new trial.

There is another point in the case, upon which, in the view I have taken of the subject, it would not be necessary for me to express an opinion. As it may, however, embarrass the parties, on a future trial, (if there should be any,) it may as well be disposed of. I allude to the exclusion by the judge, of the testimony of the witness who was called to say, that from reading the libel, *he* applied it to the plaintiff. This evidence was properly overruled. The intention of the defendant is not the subject of proof, by witnesses, in the way here attempted. It is the mere opinion of the witness, which cannot, and ought not to have any influence upon the verdict. I consider the evidence as inadmissible, because it goes to

NEW-YORK,
Nov. 1809.

VAN VECH-
TEN
v.
HOPKINS.

prove the correctness of an *innuendo*. This kind of evidence, I know, has frequently, though I think erroneously, been admitted at *nisi prius*. From what has been said before, of the nature and use of an *innuendo*, technically so called, it is clear that it cannot be the subject of proof by witnesses : Not so of an *averment*'and *colloquium*, which introduce into the pleading extrinsic matter, which is the proper subject of proof. This is fully stated by Mr. *Pollexfen*, who was afterwards chief justice of the *common pleas*, in his able argument in *Rosewell's* case. (3 *St. Tr.* 1058, 1059.) " I never knew," says he, " an *innuendo* offered to be proved ;" and his doctrine was admitted both by the court, and by the *attorneygeneral*, in his reply.

My opinion, therefore, is, that the nonsuit should be set aside, and a new trial be awarded.

KENT, Ch. J. THOMPSON, J. and YATES, J. were of the same opinion.

SPENCER, J. My brethren think that I erred, at the circuit, in nonsuiting the plaintiff ; and that it should have been submitted to the jury to determine, whether from the whole matter contained in the libel, the plaintiff was charged with being one of the persons who had subscribed the articles of coalition. If the libel warrants the idea, that the plaintiff was charged with subscribing the articles of coalition, then undoubtedly, instead of nonsuiting the plaintiff, the jury should have been charged to find a verdict for him.

The rejection of the witness called at the trial, to give a construction to the libel, unaided by any circumstances within the knowledge of the witness, except what he obtained from reading the libel, my brethren think correct ; and indeed it seems to me, that to permit a witness to be heard on the construction of a paper, and to give his

NEW-YORK,
Nov. 1809.

VAN VECH-
TEN
vs.
HOPKINS.

opinion, in aid of the court and jury, is against every principle of law. It would be giving up the prerogative of the court, and this too most unnecessarily. The legal effect of every paper produced in evidence, is matter for the decision of the court; and why it is not equally so upon a libel, when its construction and import come in question, I am at a loss for a reason.

It would appear to me, to follow, as a necessary consequence, if the rejection of the witness coming to construe the libel, was correct, that then, the construction appertained to the court, as matter of law. Let me not be understood to say, that it is the business of the court, in all cases of libels, conclusively to give that construction; for whenever there are matters of fact, arising from the *innuendoes*, which become contested, then it is peculiarly within the province of the jury to pass on those facts. In the present case, there were no such facts; for the only matters of fact proved, *dehors* the libel, were, that the plaintiff, at the time when the defendant charges in the libel, to have seen the corrupt agreement at the plaintiff's office, as well as at the publication of the libel, was recorder of the city of *Albany*, and at the former period, was also a member of the assembly of this state, and that the plaintiff was the only person of the name of *Abraham Van Vechten*, resident in the city of *Albany*, and that he kept an office there. These facts were not ascertained, and what then, were the jury to decide? Whether from the terms of the libel, upon a fair and just construction of its several parts, the plaintiff was implicated as one of the subscribers to the articles of coalition; and on what did this depend? most undoubtedly upon the libel itself. In every view in which I can consider the case, it appears to me, that it became a question for the court to decide, what was the legal import of the libel, and whether the plaintiff was implicated as one of the subscribers to the corrupt agreement.

NEW-YORK,
Nov. 1809.

VAN VECH-
TEN

HoINS.

What would have been the defendant's situation, had the construction of the libel been submitted to the jury, and had they found for the plaintiff? There are *innuen-does* in this declaration, not proved upon the trial, which might possibly have produced ·a motion in arrest of judgment. I mean the *innuendo* in which the plaintiff avers that himself and several other leading federalists were meant and intended.

The principles in relation to actions for defamatory words, as well as upon libels, are well settled ; that the person slandered or libelled must be certain, and that if words are uncertain and do not designate any particular person, no averment shall make them actionable ; (*Roll. Abr.* 81. 1. 25. 79.) and that where words are ambiguous, and equivocal, and require explanation, by reference to some extrinsic matter, to make them actionable, it must not only be predicated that such matter existed, but also that the words were spoken of and concerning that matter. (8 *East*, 431. *Cowp.* 648.) If a person should say of three witnesses, one of you is perjured, none of them shall have an action. (*Roll. Abr.* 81. 1. 25.) So in the familiar case, where a person was charged with burning a barn, *innuendo*, a barn full of corn, the *innuendo* was held to be irrelevant, and incapable of enlarging the words which were uncertain. Having premised thus much, I proceed to consider the libel. It is supposed the plaintiff's alleged reply to Mr. *Lansing*, after rebuking him for his remarks on Governor *Lewis*, " for we have agreed to support him at the ensuing election," and the alleged production of the instrument, containing articles of coalition, the first of which was an engagement by several leading federal men, whose names were thereto subscribed, to support with all their strength and influ-ence, the next election of Governor *Lewis*, in considera-tion of which the friends of Governor *Lewis*, whose names were thereto subscribed, should exert all their power

and influence to cause the election of *S. Van Rensselaer*, in the gubernatorial election of 1810, taken together, import that by the said several leading federal men, whose names were subscribed to the articles, the plaintiff was meant and intended, and is fairly designated.

Under the circumstances, as stated in the libel, what is the import of the expressions imputed to the plaintiff, " for we have agreed to support him at the ensuing election." It must be remembered, that this was urged by the plaintiff as a reason, according to the libel, why Mr. *Lansing* should not persevere in his remarks, and animadversions, upon the political character of Governor *Lewis*. And then the inquiry arises, in what sense the plaintiff must have spoken, as he is alleged to have done to Mr. *Lansing* ; whether in his individual capacity, or as one of a political sect, with whom Mr. *Lansing* was associated. It appears to me, indubitably, that the expressions, upon the most natural construction, import that the political party, to which both the plaintiff and Mr. *Lansing* belonged, had agreed to support Governor *Lewis*, at the then ensuing election ; and not that the plaintiff, and some others of the party, had individually agreed to support him. The supposed production of the instrument by the plaintiff, to verify his allegation, that that agreement had been made, does not necessarily implicate the plaintiff, if my construction is right, that the terms he is supposed to have made use of, point to the political party to which he, Mr. *Lansing*, belonged ; for if several leading federal men, had made that agreement, the plaintiff's position, " for we have agreed to support him at the ensuing election," was as well maintained, as though the plaintiff himself had subscribed the paper.

The libel is considered as implicating the plaintiff as one of the subscribers to the corrupt agreement, by force of the expressions, that it was an agreement by several leading federal men, whose names were thereto sub-

scribed. Now there is no proof in the case, to what political party the plaintiff belonged, or that he was a leading federal man; so that for aught that appears, the plaintiff is not of the description of those who are alleged to have subscribed the agreement. The declaration, indeed, contains the averment, that by the several leading federal men, mentioned in the libel, the plaintiff and several other leading federalists were meant and intended. Whether the manner in which this is introduced into the declaration, being there inserted as an *innuendo*, and not as a prefatory fact, would have entitled the plaintiff to give evidence that he was a leading federalist, I need not now examine, because no such evidence was offered or overruled. To set aside the nonsuit, on the ground that the cause should have been submitted to the jury, upon the evidence offered, is not only saying that it does not appertain to the court to construe papers given in evidence, and to decide on their import and effect, when there are no extraneous facts in controversy; but it is also saying, that the expressions supposed to have been used by the plaintiff, " for we have agreed to support him at the ensuing election," imply not only that the plaintiff subscribed the articles of coalition, but that he was a leading federal man. These inferences appear to me unnatural and unwarranted by the expressions. I therefore remain of the opinion, that the nonsuit was properly directed.

New trial granted.